***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms with minor modifications the Opinion and Award of Deputy Commissioner Harris and enters the following Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employer-employee relationship existed between Defendant-Employer and Plaintiff on the date of injury in this claim, January 4, 2000.
3. Reliance Insurance Company was the carrier on the risk on the date of injury. The North Carolina Guaranty Association has since succeeded to the obligations of Reliance Insurance Company.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Transcript of 8/19/02 hearing before Deputy Commissioner Baddour and exhibits submitted at that hearing, including Plaintiff's medical records
 • Exhibit 2: Transcript of deposition of Dr. Linda Mr. Robinson taken 1/22/03
 • Exhibit 3: Transcript of deposition of Dr. Pamela J. Whitney taken 11/11/02
 • Exhibit 4: Transcript of deposition of Bernard Moore taken 1/22/03
 • Exhibit 5: Plaintiff's medical records from Dr. Robinson
 • Exhibit 6: Plaintiff's medical records from Dr. Nailesh Dave
 • Exhibit 7: Plaintiff's medical records from Dr. Whitney
 • Exhibit 8: Plaintiff's physical therapy notes
 • Exhibit 9: Industrial Commission forms and filings
 • Exhibit 10: Plaintiff's written questions and attachments to Dr. Robinson with Dr. Robinson's responses *Page 3 
 • Exhibit 11: Form 22
The following documents were accepted at the hearing and post-hearing as Plaintiff's exhibits (unless noted otherwise):
 • Exhibit 1: Photograph of Plaintiff (submitted at hearing)
 • Exhibit 2: Social Security decision (submitted at hearing)
 NOTE: The following Plaintiff's exhibits were submitted post-hearing. They have been renumbered as set out below so as not to duplicate the use of Plaintiff's Exhibits 1 and 2.
 • Exhibit 3: Form 18
 • Exhibit 4: Employee Hospital Accident Report
 • Exhibit 5: Defendant-Employer's disciplinary policy (Defendants' objection sustained)
 • Exhibit 6: Plaintiff's listing of "major accomplishments while working at" Defendant-Employer
 • Exhibit 7: Out-of-work note from Dr. Robinson dated 1/2/01
 • Exhibit 8: Note from Dr. Robinson dated 1/3/03 expressing her opinion that Plaintiff was permanently and totally disabled because of RSD
 • Exhibits 9A B: Pay stubs
 • Exhibit 10: Photograph of Plaintiff's certificates
 • Exhibit 11A: Email dated 11/28/00 (Defendants' objection sustained)
 • Exhibit 11B: Press article (Defendants' objection sustained)
 • Exhibit 12: Emergency room record dated 1/7/00
 • Exhibit 13: (Blank sheet of paper) *Page 4 
 • Exhibit 14: Employee health nurse job description (Defendants' objection sustained)
 • Exhibit 15: Memo from Plaintiff dated 10/24/00 (Defendants' objection sustained)
 • Exhibit 16: Memo from Bette Matney dated 10/26/00 (Defendants' objection sustained)
 • Exhibit 17: Letter to Plaintiff from Clayton Potter
 • Exhibits 18A B: Pain scale documents (Defendants' objection sustained)
 • Exhibit 19: Excerpt from ESC hearing transcript (Defendants' objection sustained)
 • Exhibit 20: Excerpt from ESC hearing transcript (Defendants' objection sustained)
 • Exhibit 21: Letter to Plaintiff from Kathleen Shiloh dated 2/7/01 (Defendants objection sustained)
 • Exhibit 22: Statement by Donna Wimberly (Defendants' objection sustained)
 • Exhibit 23: Photograph of Plaintiff (same as Exhibit 1 listed above)
 • Exhibit 24: Medical records
 • Exhibit 25: Plaintiff's discovery response regarding unpaid medical bills
 • Exhibit 26: Medical bills and Form 25Ts
 • Exhibit 27: Letter to Plaintiff from Sarah E. Stout dated 5/16/00
 • Exhibit 28: Letter to Plaintiff from Sarah E. Stout dated 10/9/00 *Page 5 
 • Exhibit 29: Form 25C dated 10/3/07
 • Exhibit 30: Letter from Plaintiff to Bonnie Mullinax dated 11/14/07
 • Exhibit 31: Letter to Plaintiff from Ms. Mullinax dated 11/20/07
 • Exhibit 32: Letter to Plaintiff from Ms. Mullinax dated 9/28/07
 • Exhibit 33: Letter from Plaintiff to Executive Secretary's office dated 3/6/07
 • Exhibit 34: North Carolina Board of Nursing Certificate of Retirement
 • Exhibit 35: Excerpt from North Carolina Nursing Practice Act
 • Exhibit 36: North Carolina Board of Nursing continuing competence requirements
 • Exhibit 37: Social Security decision (same as Exhibit 2 listed above)
 • Exhibit 38: Medical records of Dr. Robert Jacobson
Following the hearing before Deputy Commissioner Harris, Plaintiff submitted Exhibits 39-44, which are admitted into evidence.
The following documents were accepted following the hearing before Deputy Commissioner Harris as Defendants' exhibits (unless noted otherwise):
 • Exhibit 1: Medical bills paid by Defendant-Carrier
 • Exhibit 2: IME report from Dr. Michael Gwinn
 • Exhibit 3: Labor market survey completed by Bernard Moore on 6/15/08 (Plaintiff's objection sustained)
 • Exhibit 4: 8/15/08 Letter from attorney Daniel Finch regarding incapacity of Dr. Whitney *Page 6 
Deputy Commissioner Harris contacted the following providers seeking their opinions on matters at issue in this claim: Dr. Robinson, Dr. Whitney, Dr. Dave and psychologist Bert Lucas. All responded except Dr. Whitney, who was unable to do so because she had become disabled and was no longer able to practice medicine. Deputy Commissioner Harris reviewed and considered the responses to the letters that he received.
 *********** RULINGS ON MOTIONS AND EVIDENTARY MATTERS
Plaintiff's Motion, pursuant to Rule 60(b) of the Rules of Civil Procedure, for relief from the previous Opinion and Award filed by the Full Commission in this claim on February 14, 2005, on her stated grounds that Defendants committed fraud on the Commission in order to obtain said Order is DENIED.
Plaintiff's Motion for Default Judgment is DENIED.
Plaintiff's Motion for Summary Judgment is DENIED.
Plaintiff made several other evidentiary objections. Her objection to the admission into evidence of the report of the IME conducted by Dr. Gwinn, on stated grounds that Defendants did not share with her in advance the questions they intended to ask Dr. Gwinn and that Defendants engaged in improper ex parte contact with her treating physician, Dr. Dave, by allegedly sharing Dr. Gwinn's report with Dr. Dave, is OVERRULED. Plaintiff's objection to the statements of facts set out in Deputy Commissioner Harris's letters to the medical providers is OVERRULED. Plaintiff's objection to Deputy Commissioner Harris's ruling at the hearing that testimony would not be heard from Rosena Mitchell, whom Plaintiff tendered to testify as to the circumstances of Plaintiff's termination from Defendant-Employer, is OVERRULED. *Page 7 
Defendants' general objection to Deputy Commissioner Harris's letters to the medical providers is OVERRULED.
Defendant's Motion to Dismiss is DENIED.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is currently 60 years of age, with a date of birth of March 3, 1949. She was a registered nurse for many years, but her license is now inactive. She was working with Defendant-Employer as the Health and Infection Control Coordinator on the date of her injury.
2. On January 4, 2000, Plaintiff was working for Defendant-Employer and sustained a compensable injury when she was forcibly pushed by a co-worker as she stood up from a chair.
3. This claim was first heard by Deputy Commissioner Baddour on August 19, 2002. Plaintiff, Defendant-Employer, and Defendant-Carrier, the same as listed in the caption above, were all parties to the first hearing. The issues heard, as set out in the Pre-Trial Agreement submitted by counsel at that hearing, was "What are the compensable consequences of Plaintiff's accident of January 4, 2000, including whether Plaintiff's various medical conditions are causally related to that accident, and whether she is entitled to any disability benefits as a result of that accident?"
4. At the time of the August 19, 2002 hearing, Plaintiff had treated with Dr. Robinson, Dr. Dave, Dr. Whitney, Dr. Laura Jozewicz (a neurologist/psychiatrist), Dr. Jacobson and Dr. Lucas. Dr. Robinson, Plaintiff's primary care provider, and Dr. Whitney, a neurologist who had also treated Plaintiff after the January 4, 2000 incident, testified via depositions *Page 8 
following the hearing with Deputy Commissioner Baddour. In his Opinion and Award, Deputy Commissioner Baddour also specifically referred to the treatment Plaintiff received with Dr. Jacobson with the Rex Pain Management Center.
5. The following medical conditions were discussed in the medical records and deposition testimony in evidence before Deputy Commissioner Baddour: hypertension, nerve palsy, Bell's palsy, peripheral neuropathy, occipital neuralgia, headaches, RSD, facial nerve palsy/neuropathy, chronic pain, myofascial pain syndrome, depression, facial weakness, eyelid drooping (ptosis), chronic myalgia/myositis, cervical brachial syndrome, and problems with concentration, imbalance, speech, swallowing and stress. With regard to RSD in particular, both Drs. Robinson and Whitney discussed it in their depositions, and Dr. Jacobson's records show he discussed "sympathetically mediated pain" in Plaintiff's face and right upper extremity prior to the hearing with Deputy Commissioner Baddour.
6. Deputy Commissioner Baddour issued his Opinion and Award on August 29, 2003. With regard to Plaintiff's medical conditions, Deputy Commissioner Baddour found that Plaintiff's headaches, diagnosed as occipital neuralgia, and neck pain were causally related to her accident at work on January 4, 2000 and that Plaintiff failed to establish that her medical conditions were causally related to her accident at work on January 4, 2000.
7. Deputy Commissioner Baddour concluded that Defendants were to pay for medical treatment for Plaintiff's "headache and neck pain conditions" and that Plaintiff was not entitled to temporary total disability compensation following her termination from Defendant-Employer on February 9, 2001.
8. In an Opinion and Award filed on February 14, 2005, the Full Commission affirmed Deputy Commissioner Baddour's Opinion and Award, quoting his findings regarding *Page 9 
Plaintiff's medical conditions verbatim and ordering Defendants to pay for medical treatment for Plaintiff's headache and neck pain conditions. The Full Commission also found that, based on Plaintiff's education as a registered nurse and her work experience, Plaintiff, even with her compensable headaches and neck pain, had wage-earning capacity because she was capable of sedentary work.
9. Plaintiff appealed the Full Commission's Opinion and Award to the North Carolina Court of Appeals, listing as her sole assignment of error whether the Full Commission had erred in finding and concluding that Plaintiff was not entitled to temporary total disability compensation after February 9, 2001. In an Order filed April 4, 2006, the Court of Appeals affirmed the Full Commission award. Plaintiff did not appeal from the Court of Appeals' decision.
10. Plaintiff was represented by counsel during the hearing process before Deputy Commissioner Baddour, the Full Commission, and the North Carolina Court of Appeals.
11. Prior to Deputy Commissioner Baddour's hearing, Plaintiff had undergone a cervical MRI on January 4, 2001, which showed a small focal midline disc protrusion at C3-4 without frank cord compression.
12. Also prior to Deputy Commissioner Baddour's hearing, Dr. Jacobson had discussed his belief that Plaintiff was suffering from radicular symptoms in her right arm.
13. On April 23, 2002, Plaintiff underwent another cervical MRI which showed a central disc herniation at C3-4, with no neural foraminal stenosis, but that the disc material was slightly deforming the ventral surface of the cervical spinal cord. Dr. Whitney, the neurologist, wrote in a note shortly after the April 23, 2002 MRI that the herniation at C3-4 was minor and *Page 10 
was not impinging on the nerve root and was thus not the cause of Plaintiff's right upper extremity symptoms.
14. On November 11, 2002, Dr. Whitney testified to the effect that she would place no work restrictions on Plaintiff for her occipital neuralgia, stating that she would assign lifting restrictions for occipital neuralgia in order to protect the neck only if the patient did very physical work.
15. On January 3, 2003, Dr. Robinson, the primary care provider, wrote that Plaintiff was totally and permanently disabled from all work because of RSD in her right arm.
16. Plaintiff received counseling with the North Carolina Division of Mental Health from January 8, 2002 through October 12, 2004. She was prescribed Prozac in January 2002 and remained on it for some time. Her diagnosis as of October 12, 2004 was acute post-traumatic stress disorder and depressive disorder, NOS. Dr. Robinson has had Plaintiff on Effexor since at least April 2003, and it has been effective at treating her depression.
17. Plaintiff continued to complain to Dr. Robinson of right head, neck, shoulder, and arm pain periodically from the latter half of 2003 through the end of 2006.
18. On August 26, 2005, Plaintiff consulted with Dr. Pamela Vick at UNC Hospitals. Plaintiff described pain in her right anterior and posterior neck, radiating up into her head and down into her right arm and right hand, and she described her right arm from her elbow to her hand as "ice cold." Dr. Vick agreed with the RSD diagnosis and made several pain management treatment recommendations.
19. By the end of 2005, Dr. Robinson described Plaintiff's right arm as not functional. *Page 11 
20. On October 25, 2006, Plaintiff underwent another cervical MRI, which was read to show a moderately large disc herniation at C3-4 and milder degenerative disc disease at C5-6 and C6-7.
21. Plaintiff returned to Dr. Dave on December 13, 2006. Dr. Dave's impression was cervalgia with trapezium pain syndrome and right upper extremity pain related to the RSD. Dr. Dave started Plaintiff on a regimen of conservative management, including medications and injections.
22. On February 27, 2007, Plaintiff complained to Dr. Dave of a gradual increase in her neck and right arm pain. Dr. Dave's impression was that Plaintiff had "increasing radicular symptoms in the upper neck suggestive of worsening of the disc disease."
23. Plaintiff underwent another cervical MRI on March 7, 2007. The impression was "moderately large disc herniation posterior central slightly paracentral to the left at C3-4 with mild disc bulges at C4-5, C5-6 and C6-7." The cervical spine was judged to be normal, with no major findings of foraminal or canal stenosis noted.
24. On March 21, 2007, Plaintiff underwent NCV testing on both upper extremities. The results were read to be abnormal, suggestive of mild bilateral ulnar neuropathy at the elbows.
25. On April 2, 2007, Dr. Dave saw Plaintiff and noted that, based on the latest MRI and NCV testing results, his impression was cervical disc disease and bilateral cubital tunnel syndrome. Dr. Dave referred Plaintiff to Dr. Robert L. Allen, a neurosurgeon, for a surgical evaluation.
26. On May 16, 2007, Plaintiff presented to Dr. Allen, who opined that Plaintiff's neck condition, as shown on the most recent MRI, was not causing enough cord compression to *Page 12 
cause radicular symptoms in Plaintiff's right arm, and he recommended that Plaintiff continue with neck exercises and pain management for her RSD.
27. As of the April 23, 2008 hearing before the deputy commissioner, Plaintiff was continuing to treat with Dr. Dave. Dr. Dave has noted that Plaintiff continues to have neck pain, worse on the right, with good success with physical therapy, Lyrica and trigger point injections, although the injections have been mostly for Plaintiff's unrelated lumbar symptoms.
28. Plaintiff underwent another cervical MRI on February 6, 2008. The impression read, "There is multilevel degenerative disc disease with associated end-plate remodeling. There are multiple areas of acquired central canal stenosis of mild to moderate severity. There is no mass effect upon the cervical cord. There is no cord edema. There is also multilevel facet and uncovertebral joint osteoarthritis with associated neural foraminal stenosis . . . Neural foraminal stenosis at C5-6 and C6-7 on the right." Following another neurosurgical consultation after this MRI, continued conservative treatment was recommended.
29. Plaintiff underwent an independent medical examination with Dr. Michael Gwinn of the Carolina Back Institute on June 2, 2008. Dr. Gwinn opined that Plaintiff's cervical condition had degenerated over time and that any worsening of said condition over the last two to three years was likely related to progression of her cervical degeneration. Dr. Gwinn further wrote, "I am unable to directly relate the cervical degeneration to her injury, but this certainly can occur with the aging process." Dr. Gwinn wrote that, while Plaintiff should avoid overhead or above-chest-level work and heavy lifting, she could work full-time in a sedentary position.
30. As of the date of the hearing before Deputy Commissioner Harris, Plaintiff had not had new pain over the previous two to three years, just worse pain. Plaintiff's headaches had gotten worse since early 2005 and Plaintiff had been falling asleep spontaneously. Plaintiff has *Page 13 
been more irritable and depressed, and has had more trouble concentrating. Plaintiff asserts that her lack of concentration and her headaches are worse than they were before early 2005 and preclude her from working in any capacity.
31. The treatment with Dr. Dave has helped relieve Plaintiff's symptoms related to her compensable headaches and neck pain, and she wants to continue treating with him. Defendants have authorized Dr. Dave for ongoing treatment of Plaintiff's compensable conditions.
32. Plaintiff has not had any mental health counseling since 2004. Dr. Robinson has prescribed Effexor for her depression symptoms, and this medication has been helpful for Plaintiff.
33. Plaintiff has not worked since January 2, 2001, other than a one-day failed attempt to work on the set of a television show and one chart review that she undertook for an attorney. Plaintiff has done some volunteer judging at beauty pageants. Plaintiff has not looked for work at all since at least January 2005.
34. Plaintiff contends that the "neck pain" that the Full Commission found to be compensable in its February 14, 2005 Order now includes myofascial pain syndrome, cervical brachial syndrome, facial pain, eyelid drooping (ptosis), nerve palsies, peripheral neuropathy and concentration issues. She also contends that referred pain to her face, eye, right shoulder and right arm are direct and natural results of her compensable "neck pain" because they follow the nerve distribution that would produce such referred pain.
35. Dr. Robinson is board-certified in family practice. Notably, she had already opined prior to Deputy Commissioner Baddour's Opinion and Award that Plaintiff's RSD in her right upper extremity was caused by the January 4, 2000 incident and that Plaintiff was *Page 14 
permanently and totally disabled as a result of the conditions caused by said incident. Dr. Robinson continues to believe that Plaintiff's occipital neuralgia with headaches secondary thereto, RSD and reactive depression and post-traumatic stress disorder are causally related to the incident. She also continues to believe that Plaintiff is "completely incompetent to pursue a career" because of her chronic pain and paresthesias and resultant concentration problems, combined with her reactive depression.
36. As to her diagnosis of reactive depression with PTSD, Dr. Robinson wrote that "due to pain, discomfort, inability to work, and perception that (Defendant-Employer) had treated her with injustice, (Plaintiff) developed severe reactive depression. Already had some `flash-backs' of original injury."
37. Dr. Robinson does not believe that Plaintiff can do sedentary work on a full-time basis, and she attributes this inability to the failure of Plaintiff's pre-January 2005 conditions failing to improve plus progressive lumbar degenerative disc disease and the moderately large disc herniation at C3-4.
38. Dr. Robinson relates Plaintiff's right upper extremity symptoms to her RSD, which Dr. Robinson remains "certain" is directly related to the January 4, 2000 incident.
39. Dr. Robinson stated that Plaintiff's occipital neuralgia would never be cured and that she would require treatment for it for the rest of her life.
40. Dr. Dave is a neurologist specializing in pain management. Since December 2006, he has treated Plaintiff for cervalgia, headache, depression, cervical disc disease, right occipital neuralgia, neck, and right upper extremity pain by utilizing pain medications, epidural steroid injections and trigger point injections. He could not say that Plaintiff's RSD and/or cervical disc disease were causally related to the January 4, 2000 incident. He believes that she *Page 15 
is permanently disabled, although he did not say whether Plaintiff's compensable headache and neck pain conditions had substantially worsened since January 2005.
41. Dr. Dave stated that Plaintiff would most likely remain in pain for her entire life and might require different modalities than she is currently receiving to address the pain.
42. Dr. Lucas is a clinical psychologist. He last saw Plaintiff on September 6, 2002 and treated her for PTSD and depressive disorder, NOS. He wrote that he "had little doubt that the symptoms that (he) was treating at the time were a direct result of the (January 4, 2000) incident," and he confirmed that the incident substantially caused, aggravated and/or accelerated Plaintiff's clinical depression.
43. Dr. Lucas deferred to Drs. Dave and Robinson as to current causation questions, work restrictions and treatment recommendations, and he recommended a full psychological evaluation for Plaintiff before determining whether further mental health treatment was necessary for the conditions he attributed to the incident. Dr. Lucas could not say whether Plaintiff's physical and/or mental ability to perform work in the competitive economy had changed substantially since January 2005.
44. In her notes and testimony in evidence at the time of Deputy Commissioner Baddour's hearing, Dr. Whitney, the neurologist, opined that Plaintiff's cervical disc disease and RSD were not related to the January 4, 2000 incident. Dr. Dave's statements now are consistent with Dr. Whitney's prior testimony. Although Dr. Robinson, on the other hand, has always believed that Plaintiff's RSD is related to the incident, the Full Commissioner gives more weight to the opinions of Dr. Dave, a neurologist, than to those of Dr. Robinson, a family physician. *Page 16 
45. Plaintiff filed her Form 33 on February 12, 2007. In response to a discovery request from Defendants, Plaintiff served on Defendants, on or about April 25, 2007, a listing of every outstanding medical bill that she contended was owed at that time.
46. Defendants moved to dismiss Plaintiff's Form 33, and, on January 22, 2008, Deputy Commissioner Rowell filed an Order denying the Motion. Deputy Commissioner Rowell ruled that Plaintiff could pursue her claim for change of condition under N.C. Gen. Stat. § 97-47. He also found that Defendants had failed, following the expiration of the appeal deadline from the Court of Appeals' decision, to pay Plaintiff the back temporary total disability compensation that had been previously ordered by the Full Commission, and, as such, he ordered Defendants to pay said lump sum plus a ten percent late payment penalty. He also ordered Defendants to pay all medical expenses incurred or to be incurred by Plaintiff as a result of her compensable injury when bills for same have been approved.
47. Since the filing of Deputy Commissioner Rowell's Order, Defendants have paid $2,310.00 to Plaintiff for the lump sum indemnity due plus the penalty, and they have also made substantial medical bill payments and payments for prescriptions and mileage.
48. Defendant-Carrier has assigned a nurse case manager, Bonnie Mullinax, to assist in coordinating Plaintiff's treatment and in procuring unpaid medical bills and corresponding medical records. Ms. Mullinax's involvement has been helpful in clearing up old medical bills and in administering Plaintiff's ongoing treatment.
49. The process of paying the old medical bills has been complicated in many instances by the need to have the bills re-submitted in the proper format, with proper billing codes, so that Defendant-Carrier could verify that the billing was related to the compensable conditions. *Page 17 
50. Deputy Commissioner Harris requested that Plaintiff submit, with her Contentions, a list of the dates, amounts, providers, procedures and any third-party payors on any and all outstanding medical bills that Plaintiff contended Defendants still owed as of the date of the Contentions. Plaintiff submitted such a list, and Defendants, as also requested by the undersigned, then submitted their positions on said bills.
51. The great majority of the bills Plaintiff listed in her Attachment A to her Contentions before Deputy Commissioner Harris pertain to pain management treatment rendered from November 22, 2000 through July 29, 2002 by Dr. Jacobson. Dr. Jacobson's records show that he saw Plaintiff for both her compensable headaches/neck pain and her non-compensable facial pain and right shoulder pain. He performed, under anesthesia at Rex Healthcare, right occipital nerve blocks for her headaches, right stellate ganglion nerve blocks for her facial pain, trigger point injections to her right trapezius muscle, and cervical epidural steroid injections for her radicular symptoms, often performing more than one block at the same time under the same anesthesia.
52. The following services provided by Dr. Jacobson/ Rex Hospital are compensable and should be paid by Defendants: 11/22/00 consultation; 12/11/00 consultation, occipital nerve block and anesthesia; 12/29/00 consultation, occipital nerve block and anesthesia; 1/26/01 consultation, occipital nerve block and anesthesia; 10/8/01 consultation, occipital nerve block and anesthesia; 11/27/01 consultation, occipital nerve block and anesthesia, and; 7/29/02 consultation, occipital nerve block and anesthesia. As to these services, which Defendants have disputed, Deputy Commissioner Harris found no excuse for the late payment. All other services by Dr. Jacobson as listed by Plaintiff in Attachment A were not related to her compensable conditions and Defendants are not responsible for them. *Page 18 
53. The other specific expenses listed by Plaintiff in Attachment A are for an emergency room visit for headaches on February 23, 2000, a TENS unit ordered by Dr. Jacobson on March 1, 2002, and the three cervical MRIs on October 25, 2006, March 7, 2007 and February 6, 2008. Defendants have agreed to make all these payments. Defendants state that they have attempted to make the emergency room payment, but the check was returned. As such, Defendants can make this payment directly to Plaintiff, and Plaintiff will be responsible for forwarding the funds to the correct party.
54. Further medical treatment is reasonably required to effect a cure and/or provide relief for Plaintiff's compensable occipital neuralgia and/or neck pain condition(s).
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. This proceeding, since Plaintiff's filing of her Form 33 in 2007, through the hearing before Deputy Commissioner Harris and Plaintiff's many post-hearing submissions, have been Plaintiff's attempt to re-litigate the relatedness of various medical conditions to the January 4, 2000 incident. These conditions were already determined by Deputy Commissioner Baddour and the Full Commission to be not causally related to the incident. Following Plaintiff's failure to appeal these issues, the Full Commission's Order became final. As such, Plaintiff is barred by the doctrine of resjudicata from now claiming that the following conditions are compensable: myofascial pain syndrome, chronic myalgia/myositis, cervical brachial syndrome, facial pain/weakness, eyelid drooping (ptosis), nerve palsies, Bell's palsy, *Page 19 
peripheral neuropathy, depression, concentration issues and RSD in her face and right upper extremity.
2. Plaintiff has not met her burden of proving that her compensable headache and neck pain conditions have substantially worsened to the point that she has become physically incapable, because of said conditions, of earning wages in the competitive economy since the earlier decisions in this claim. If Plaintiff was physically capable of doing sedentary work as of 2005, as the Full Commission concluded in 2005, she has not shown that she is not capable of sedentary work now. As such, Plaintiff has failed to show that she has suffered a change of condition. N.C. Gen. Stat. § 97-47.
3. Plaintiff has also failed to show that her depression since the earlier decisions in this claim is any different from that diagnosed prior to the first hearing with Deputy Commissioner Baddour or that her depression now is significantly related to her compensable conditions. As such, her depression remains not compensable.Id.
4. Even if there had been an actual change to Plaintiff's compensable headache and neck pain conditions that caused her depression to be made worse, Plaintiff has not shown that such worsened depression has changed her wage-earning capacity in any way. Russell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993).
5. Plaintiff's RSD, cervical herniations, cervical disc disease, cervical radicular symptoms and/or her low back symptoms are not causally related to the January 4, 2000 incident and are not compensable. Click v. Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980).
6. Plaintiff's right upper extremity pain is most significantly related to her non-compensable RSD, rather than her compensable neck pain, and is thus not compensable. N.C. Gen. Stat. § 97-2 (6);Click v. Freight Carriers, 300 N.C. 164, 265 S.E.2d 389 (1980). *Page 20 
7. Plaintiff is entitled to continue receiving medical treatment from Defendants for her compensable occipital neuralgia and neck pain condition(s). Given the statements of Drs. Robinson and Dave, the undersigned concludes that there is a substantial risk of the necessity of future medical treatment for Plaintiff's compensable conditions, and the limitations period of N.C. Gen. Stat. § 97-25.1 therefore should not apply.
8. Dr. Dave should be designated as Plaintiff's treating physician for her compensable occipital neuralgia and neck pain condition(s), and Defendant shall authorize and pay for the treatment that he recommends for said condition(s), including but not limited to diagnostic testing, injections, prescriptions, physical therapy, referrals and mileage. N.C. Gen. Stat. § 97-25.
9. Defendant-Carrier should continue to utilize nurse case manager Mullinax to coordinate Plaintiff's treatment and the payment of medical compensation in this claim. Id.
10. Plaintiff is entitled to have Defendants pay the outstanding medical bills as set out in Findings of Fact Nos. 52 and 53 above.Id. Plaintiff is further entitled to a ten percent late payment penalty to each outstanding bill for the services of Dr. Jacobson/Rex Hospital. N.C. Gen. Stat. § 97-18(i).
11. To the extent Medicare, Medicaid or any other third party payor has paid for any treatment for Plaintiff's compensable occipital neuralgia and/or neck pain conditions, including but not limited to those amounts specifically shown on Plaintiff's Attachment A, Defendants shall reimburse such payor(s) in full for such payments at the appropriate time. N.C. Gen. Stat. § 97-90.1.
12. To any extent they have not already done so, Plaintiff is entitled to have Defendants pay for her mileage incurred for her visits to treat for her compensable condition(s) *Page 21 
with Drs. Robinson, Dave, Jacobson, Whitney and/or any other provider(s) who have treated Plaintiff for her compensable condition(s), upon presentation by Plaintiff of properly executed Form 25Ts. N.C. Gen. Stat. § 97-25.
13. Plaintiff is entitled to have defendants pay for her out-of-pocket prescription expenses incurred for treatment of her compensable conditions with Drs. Robinson, Dave, Jacobson, Whitney and/or any other provider(s) who have treated Plaintiff for her compensable condition(s), upon presentation by Plaintiff of properly executed Form 25Ts. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for a change of condition must, is Denied.
2. Defendants shall continue to authorize and pay for medical treatment for Plaintiff's compensable occipital neuralgia and neck pain condition(s), without regard to any limitations period, for the remainder of Plaintiff's life.
3. Dr. Dave is designated as Plaintiff's treating physician for her compensable occipital neuralgia and neck pain condition(s), and Defendants shall authorize and pay for the treatment that he recommends for said condition(s), including but not limited to diagnostic testing, injections, prescriptions, physical therapy, referrals and mileage.
4. Defendant-Carrier shall continue to utilize nurse case manager Mullinax to coordinate Plaintiff's treatment and the payment of medical compensation in this claim. *Page 22 
5. If they have not done so already, Defendants shall pay the outstanding medical bills as set out in Findings of Fact Nos. 52 and 53 above. Defendants shall add a 10 percent late payment penalty to each outstanding bill for the services of Dr. Jacobson/Rex Hospital. N.C. Gen. Stat. § 97-18(i).
6. To the extent Medicare, Medicaid or any other third party payor has paid for any treatment for Plaintiff's compensable occipital neuralgia and/or neck pain condition(s), including but not limited to those amounts specifically shown on Plaintiff's Attachment A, Defendants shall reimburse such payor(s) in full for such payments at the appropriate time.
7. To any extent they have not already done so, Defendants shall pay Plaintiff for her mileage incurred for her visits to treat for her compensable occipital neuralgia and/or neck pain condition(s) with Drs. Robinson, Dave, Jacobson, Whitney and/or any other provider(s) who have treated Plaintiff for her compensable condition(s), upon presentation by Plaintiff of properly executed Form 25Ts.
8. To any extent they have not already done so, Defendants shall pay Plaintiff for out-of-pocket prescription expenses incurred for treatment of her compensable occipital neuralgia and/or neck pain condition(s) with Drs. Robinson, Dave, Jacobson, Whitney and/or any other provider(s) who have treated Plaintiff for her compensable condition(s), upon presentation by Plaintiff of properly executed Form 25Ts.
9. Defendants shall pay the costs. As part of these costs, if they have not done so already, Defendants shall pay an expert witness fee to each of the following providers, in the amount shown: Dr. Robinson, $354.00; Dr. Dave, $437.00, and; Dr. Lucas, $552.00.
This the 11th day of December 2009. *Page 23 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ LAURA K. MAVERETIC COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER